

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LVP ASSOCIATES L.L.C. and 349
ASSOCIATES L.L.C.,

                    Plaintiffs,

-against-

BANK OF CHINA, NEW YORK BRANCH,

                    Defendant.

17-cv-5274 (SHS)

OPINION & ORDER

---

SIDNEY H. STEIN, U.S. District Judge.

This contract dispute concerns three loans issued by defendant Bank of China, New York Branch to three New Jersey limited liability companies controlled by the same real estate investor. The loans are secured by mortgages on three commercial buildings in New Jersey. Two of the limited liability companies – LVP Associates LLC and 349 Associates LLC – now wish to repay their loans in order to sell the encumbered properties. However, the Bank refuses to allow them to do so, or to release its security interests in the underlying properties, until the separate loan to the third company (non-party 769 Associates LLC) is also repaid.

LVP Associates and 349 Associates have now brought this action seeking a declaration that 1) the loan agreements permit them "to repay in full their respective loans and have all repayment proceeds be applied strictly to their respective loans and no other loans," and 2) they are entitled to "a release of any security interest held by the Bank on their commercial buildings upon repayment in full of their respective loans." (Compl. at 12.)

Plaintiffs have now moved for summary judgment granting those declarations and the Bank has cross-moved for summary judgment dismissing the complaint. For the reasons that follow, the Court grants plaintiffs' motion in part and defendant's cross-motion in part and otherwise denies those motions.

I. BACKGROUND

A. The Original Agreements

349 Associates LLC, LVP Associates LLC, and 769 Associates LLC are New Jersey limited liability companies managed and controlled by real estate investor Paul V. Profeta. (Profeta Decl., Doc. 15 ¶¶ 1–2; Profeta Aff., Doc. 32.) On May 22, 2007, each of the three companies entered into a separate written agreement with defendant Bank of China to obtain loans – ranging in amount from $7.35 million to $14.35 million – in order to refinance three commercial buildings in Essex County, New Jersey. (Profeta Decl. ¶¶ 3–4.) At the same time, each company executed a promissory note and mortgage agreement granting the Bank a security interest in the property for which the loaned money was to be used. The LVP

building is located in Maplewood, the 349 building in Livingston, and the 769 building in West Orange, New Jersey. (*See* Original Mortgages, Doc. 16-7; 16-8; 16-9.)

The parties' present dispute turns on a small number of provisions scattered throughout these contracts.[1] As relevant here, the original mortgage provided the following "express condition" on the grant of the Bank's security interest in the underlying property, in a passage later identified as Section 2(b):

> [I]f Mortgagor shall well and truly pay to Mortgagee [Bank of China] the Debt at the time and in the manner provided in the Loan Documents and shall *well and truly abide by and comply with each and every covenant and condition set forth in the Loan Documents* in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void . . . .

(Original Mortgage, Doc. 16-7 at 5 (emphasis added).)

In the original loan agreement, Section 2.3.1, entitled "Repayment," provided in relevant part:

> Except during the continuance of an Event of Default, all proceeds of any repayment, including permitted prepayments, of the Loan shall be applied by Lender as follows *in the following order of priority*: First, accrued and unpaid interest at the Interest Rate; Second, to Principal; and Third, any other amounts then due and owing under the Loan Documents. . . . During the continuance of an Event of Default, all proceeds of repayment . . . shall, unless otherwise provided in the Loan Documents, be applied *in such order and in such manner as Lender shall elect in Lender's discretion*.

(Original Loan, Doc. 16-1 at 6–7 (emphases added).) In each agreement, the defined term "Loan Documents" *referred to the specific loan agreement, mortgage, and promissory note associated with that particular loan*. (*Id.* at 3; Original Mortgage at 2.)

Section 8.1 of each loan agreement enumerated twenty-one circumstances that constituted events of default with respect to the loan. (Original Loan at 33–35.) Various consequences and remedies for default – including the ability of the Bank to accelerate the debt by declaring it immediately due and payable – were specified in a series of provisions including loan agreement Section 8.2 and Mortgage Paragraph 10. (*Id.* at 35–37; Original Mortgage at 8–11.) In addition, loan agreement Section 5.16 provided for defendant to receive reimbursement for "reasonable out-of-pocket costs and expenses" incurred in connection with the loans, including costs of litigation. (Original Loan at 23–24.)

---

[1] The contracts are attached as Exhibits 1–15 to the Dahan Declaration. (Doc. 16.) Because the three LLCs' respective agreements are identical in all material respects, citations in this Opinion are to the LVP version of each document unless it is helpful or necessary to refer to each separately.

## B. The 2010 Amendments

Three years later, in 2010, the parties agreed to amend both the loan agreements and the mortgages as part of the settlement of a totally separate dispute. Among other changes, Section 2(a) of the amendment to the mortgage provides for the cross-collateralization of the three loans. (Mortgage Amendment, Doc. 16-13 at 2–3.) Thus, each loan became secured by mortgages on the three properties underlying all three of the loans instead of the single property specified in each original mortgage.

The amendment to the loan agreement created new defined terms (viz., "Related Loan Documents," "Related Loan Parties," and "Related Property Loans") to refer in each agreement to the loans entered into by Profeta's other two companies. (Loan Amendment, Doc. 16-10 at 1–2.) Those terms appear in a number of amended loan agreement provisions including Section 5.15.3, a new subsection governing transfers of the underlying properties to third parties who will not assume the borrower's obligations pursuant to the loan documents. In relevant part, Section 5.15.3(a) provides that the original borrower must pay the Bank 115% of the outstanding principal as consideration for such a transfer, and that that amount shall be allocated in the following order of priority:

> First, to the payment of the outstanding Principal of the Loan; Second, to the payment of any outstanding costs and expenses (including Late Payment charges and reasonable attorney's fees and expenses), then due to the Lender under the Loan Documents; Third, to the payment of accrued and unpaid interest; *Fourth, the balance, if any, shall be applied to the reduction of the outstanding principal balance of either or both of the Related Property Loans.*

(*Id.* at 5 (emphasis added).) The parties also added a cross-default provision, Section 8.1(k), whereby a default on any one loan constituted a default on the other two Related Property Loans as well. (*Id.* at 8.)

The parties did not at that time amend the key passages of loan agreement Section 2.3.1 and mortgage Section 2(b) that are quoted and emphasized above and are relevant to the parties' dispute, except that they added the word "sole" before "discretion" in the final sentence of Section 2.3.1. They also amended other, non-material portions of those sections. (*See id.* at 4; Mortgage Amendment at 3.)

## C. The Present Dispute

In April 2017 – seven years after the amendments limned above – LVP Associates and 349 Associates informed the Bank that they desired to repay the LVP and 349 loans in full and obtain the release of the Bank's security interests in the two underlying properties in order for plaintiffs to sell the properties to third party buyers. (Pls.' Reply 56.1 Statement, Doc. 26 ¶ 15.) However, the parties' discussions on this topic soon hit a series of roadblocks. As relevant here, the Bank asserts that at least one event of default had occurred on the loan to non-party 769 Associates LLC – and hence, by virtue of the loan agreement's cross-default provision, Section 8.1(k), on plaintiffs' loans as well. (*Id.* ¶ 21.) Plaintiffs dispute that any

3

event of default has occurred, but all parties regard this factual disagreement as immaterial to the legal questions of contract interpretation currently before the Court. (*See* Def.'s Mem., Doc. 21 at 2; Pls.' Reply Mem., Doc. 24 at 3 n.3.)

The Bank takes the position that the relevant contracts entitle it to receive repayment in full of all three loans before it is obligated to release its security interest in any of the properties. (Pls.' Reply 56.1 Statement ¶¶ 22–24.) Plaintiffs disagree: they believe that the contracts give them the right to repay the LVP and 349 loans, and receive the release of the Bank's security interest in the LVP and 349 buildings, without repaying the 769 loan at this time. (*Id.* ¶¶ 25–27; Pls.' Mem., Doc. 13 at 1.) Because the Bank has stated it intends to apply any repayment proceeds toward the 769 loan balance (as it believes it has the right to do), LVP Associates and 349 Associates have refrained from repaying the LVP and 349 loans. (Pls.' Reply 56.1 Statement ¶¶ 23, 50; Profeta Decl. ¶¶ 14–20.)

In order to break the impasse, LVP Associates and 349 Associates filed this action in July of this year seeking a declaratory judgment endorsing their interpretation of the parties' contracts to allow the repayment of only their respective loans and, upon that repayment, the release of defendant's security interests in plaintiffs' properties.[2] (Compl. at 12.)

As noted above, the parties have now cross-moved for summary judgment in their favor.[3]

## II. Discussion

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016). "The same standard applies where the parties file cross-motions for summary judgment. Each party's motion is examined independently, with the Court drawing all reasonable inferences against the party whose motion is under consideration." *Specialty Nat. Ins. Co. v. English Bros. Funeral Home*, 606 F. Supp. 2d 466, 470 (S.D.N.Y. 2009) (citations omitted).

Although summary judgment is generally appropriate only after adequate time for discovery, *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000), such a motion may be granted prior to discovery "[i]f there are 'no relevant disputed issues of fact.'" *Liberty Mut. Ins. Co. v. N. Picco & Sons Contracting Co.*, No. 05 CIV. 217 (SCR), 2008 WL 190310,

---

[2] The Bank answered the complaint and asserted a counterclaim to recover its out-of-pocket costs, including reasonable attorneys' fees, incurred in connection with the present dispute pursuant to loan agreement Section 5.16. (Answer, Doc. 10 at 6–7.)

[3] Prior to this suit being filed, all three Profeta loans matured on July 1, 2017. None has been repaid. (Pls.' Reply 56.1 Statement ¶ 50.)

4

at *4 (S.D.N.Y. Jan. 16, 2008) (quoting *S. & S. Realty Corp. v. Kleer-Vu Indus., Inc.*, 575 F.2d 1040, 1044 (2d Cir. 1978)).

The parties agree that New York law governs the contracts at issue. Under New York law, "if a contract is unambiguous on its face, its proper construction is a question of law" that may be resolved on summary judgment, *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 89 (2d Cir. 2013) (internal quotation omitted), but "contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase," *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011); *see also Karas v. Katten Muchin Zavis Rosenman*, No. 04 CIV. 9570 (SHS), 2006 WL 20507, at *8 (S.D.N.Y. Jan. 3, 2006), *aff'd sub nom. Karas v. Katten Muchin Rosenman LLP*, No. 07-1545-CV, 2009 WL 38898 (2d Cir. Jan. 8, 2009) (summary order).

"Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). Contract provisions are unambiguous if they "have a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978).

On the other hand, "ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). However, "[t]he court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would 'strain[] the contract language beyond its reasonable and ordinary meaning.'" *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (second alteration in original) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)).[4]

Here, plaintiffs and defendant both submit that the case is susceptible to summary judgment prior to discovery because the contracts evince unambiguous meaning. The parties simply dispute what that ineluctable meaning is.

---

[4] A footnote in plaintiffs' reply memorandum suggests that any ambiguity should be construed against the Bank because the Bank drafted the agreements at issue here. (Pls.' Reply Mem. at 6 n.6.) But loan agreement Section 9.16 expressly provides that "the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them." (Original Loan at 43.) Regardless, because the parties' other arguments suffice to resolve the case, the Court's ruling does not rely on this principle.

## B. Loan Agreement Section 2.3.1 Entitles Plaintiffs to Repay Each Loan Independently.

The Bank contends that the loan agreement entitles it to take money delivered by LVP Associates and 349 Associates for the purpose of repaying their own loans and apply those funds instead to any outstanding balance on the 769 loan. (Def.'s Mem. at 10–13.) The textual hook on which the Bank rests this argument is the last sentence of Section 2.3.1. As set forth above, that provision, as amended, specifies that absent any event of default, repayment proceeds shall be applied first to accrued interest, second to principal, and third to any other amounts due on each loan; but if an event of default has occurred, repayment proceeds "shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as [Bank of China] shall elect in [its] sole discretion." (Loan Amendment at 4.)

The literal breadth of this phrase, read in isolation, might encompass defendant's endeavor to apply proceeds of repayment on one loan to the balance of another. But the New York Court of Appeals has cautioned that written contracts "should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases." *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007). In context, several factors strongly favor plaintiffs' alternative interpretation: during a default, Section 2.3.1 empowers the Bank to change the order in which it applies repayment proceeds to the various debts outstanding on a particular loan, but not to use those funds to repay a different loan balance (or for any other purpose).

First, although the Bank correctly characterizes the "sole discretion" phrase in Section 2.3.1 as "deliberately broad," (Def.'s Mem. at 10), any reasonable reading of the clause must include some implied limitation on the Bank's range of options. Otherwise, as plaintiffs observe, there is no reason to stop at inter-loan allocation; if no limitation on the Bank's discretion were to be implied, then the Bank could arguably apply the loan proceeds to the Bank's own expenses or even "vacations for executives." (Pls.' Reply Mem. at 5.)

What limiting principle exists in the provision's language itself? Section 2.3.1's text suggests that the Bank's discretion does not extend beyond the limits of any single loan. That section refers throughout to contractually defined terms – e.g., "the Loan Documents," "the Loan," "the Principal" – that are expressly limited to the specific loan covered by each agreement. The "sole discretion" clause is specified as an alternative to the "order of priority" (indisputably referring only to debts under one particular loan) that operates when there is no event of default. And the express condition attached to the final clause itself – "unless otherwise provided *in the Loan Documents*" – again refers only to the specific agreements governing the loan at issue. (Loan Amendment at 4 (emphasis added)). The contractual language of each loan agreement's Section 2.3.1 contains no reference – indeed not even a hint of a reference – to any other loan.

Examining the provision in the broader context of the parties' contractual relationship reinforces this conclusion. As explained above, the relevant language of Section 2.3.1 has not changed since the time of the original 2007 agreements, except for the addition of the word "sole." (*See* Original Loan at 7.) Until the 2010 amendment adding cross-collateralization,

however, each loan agreement lacked *any* reference whatsoever to the other two Profeta loans. It is difficult to believe that the word "discretion" constituted a *sub silentio* reference to separate transactions never directly named in the document.

It also strains credulity to read the 2010 amendment as implicitly expanding the scope of the Bank's discretion under Section 2.3.1, the repayment provision, to extend to other loans. Elsewhere in the loan agreement, the parties specifically added references to "Related Loan Documents," "Related Loan Parties," and "Related Property Loans" when they meant to refer to loans beyond the one at issue in each contract. In particular, Section 5.15.3(a) clearly specifies one circumstance in which defendant may apply payments on one loan toward the balance of another: "Fourth, the balance, if any, shall be applied to the outstanding principal balance of either or both of the Related Property Loans." (Loan Amendment at 5.) But the parties conspicuously failed to add comparable language to the relevant text of Section 2.3.1, even though they made other amendments to this provision. (*Id.* at 4.) Under New York law, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (internal quotation omitted).

The Bank offers two structural inferences to prop up its contrary interpretation of the amended loan agreement, but neither stands up under analysis. The Bank urges first that plaintiffs' reading of Section 2.3.1 would impermissibly "effectively delete the cross-collateralization from the Profeta Loan Agreements and the Profeta Mortgages." (Def.'s Mem. at 11.) Here, defendant conflates the right to foreclose on a related loan's underlying property with the ability to take payments toward one loan and apply them to another. There is no reason a contract could not grant a lender one right but not the other, and no need exists to twist this provision's language to give effect to the cross-collateralization amendment.

Next, the Bank gamely suggests that Section 5.15.3 indirectly supports its own position rather than plaintiffs'. That section, entitled "Transfers of Property; Condominium Conversion," in relevant part, allows the borrowing company to sell the property if it pays 115% of any outstanding principal on the loan. Defendant argues that plaintiffs' narrow reading of Section 2.3.1 must be rejected because it would counterintuitively afford the Bank *fewer* rights when a borrower defaults: "in the event LVP, 349 and/or 769 wanted to sell one of their properties, they could simply default and then immediately pay off their loans [i.e., pursuant to Section 2.3.1] without having to pay the 115% of principal it would otherwise be obligated to pay under Section 5.15.3 if no Event of Default was continuing." (*Id.* at 12–13.) This herring is bright red. The source of plaintiffs' apparent ability to escape the 115% consideration requirement is not the "sole discretion" clause but the separate provision allowing voluntary prepayment, Section 2.3.3. (*See* Loan Amendment at 5.) Whether or not plaintiffs' prepayment rights allow them to effectively circumvent the restrictions on property transfers in certain circumstances has nothing to do with Section 2.3.1's operation during an event of default.

In sum, defendant seeks to evade the most natural reading of the loan agreement in order to more fully effectuate what it regards as the purpose of certain contract provisions. But in New York, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). If there were any doubt as to the application of this principle here, the courts have confirmed that the rule that a contract is enforced according to its terms applies "with even greater force in commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople," *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (1st Dep't 2012), and that the need for disciplined textual interpretation is "all the more compelling in the context of real property transactions, where commercial certainty is a paramount concern," *W.W.W. Assocs.*, 77 N.Y.2d at 162. The Bank's attempt to stretch the language of Section 2.3.1 to meet its own ends is roundly rejected by this Court. Plaintiffs are entitled to summary judgment in their favor as to the question of independent loan repayment.[5]

## C. Mortgage Section 2(b) Does Not Entitle Plaintiffs to a Release from Their Mortgages if They Are in Default.

Plaintiffs also urge that the mortgage entitles them to the release of the Bank's security interest in the particular property associated with each loan upon the full repayment of that particular loan. (Pls.' Mem. at 2.) The Bank insists instead that the persistence of one or more events of default allows it to withhold the release of its security interests in all three properties. (Def.'s Mem. at 13–15.) Because the loans have now reached maturity, defendant asserts that each will remain in default until all three are repaid, pursuant to the cross-default provision in loan agreement Section 8.1(k), as amended. By this interpretation, the Bank may effectively bar LVP Associates and 349 Associates from recovering the security interests in their properties until the 769 loan is also paid in full.

In pertinent part, Section 2(a) of each mortgage grants defendant an interest in a particular piece of property and the building located thereupon, as identified in an attached schedule. (Mortgage Amendments, Doc. 16-13 at 3; 16-14 at 3; 16-15 at 3.) In language

---

[5] The Bank contends in passing that plaintiffs cannot receive the declaratory relief they seek unless they make a showing that they were "ready, willing, and able" to repay the loan to LVP Associates and the loan to 349 Associates. It is not enough, the Bank contends, for plaintiffs to simply state they seek to repay those loans. That argument is misdirected here. New York law requires such a showing only for plaintiffs seeking specific performance or damages for breach of contract. *See Ferchaw v. Troxel*, 112 A.D.3d 1310, 1312 (4th Dep't 2013) ("[D]efendant's contention lacks merit. Although a plaintiff seeking specific performance or monetary damages for nonperformance of a contract must demonstrate that he or she was ready, willing and able to perform on the contract, plaintiffs in this case have not requested specific performance or monetary damages; instead, their complaint seeks declaratory relief . . . ." (citations omitted)).

materially unaffected by the 2010 amendment, Section 2(b) provides that the Bank's interest in the property "shall cease, terminate and be void" if the borrower satisfies two obligations: first, to pay the amounts owed under the particular loan agreement, and second, to "well and truly abide by and comply with each and every covenant and condition" in the loan's governing documents "in a timely manner." (Original Mortgage at 5; Mortgage Amendment at 3.)

Defendant builds its argument on the latter condition, reasoning that borrowers' defaults constitute failures to abide by and comply with the covenants and conditions of each loan, which preclude the return of the Bank's security interest even if a given loan has been repaid in full (the first condition for release). (Def.'s Mem. at 14.)

Neither "covenant" nor "condition" is a defined term in these contracts. But their plain meaning is broad. *See, e.g.*, Black's Law Dictionary 355–56 (10th ed. 2014) ("[C]ondition. . . . 2. A stipulation or prerequisite in a contract, will, or other instrument, constituting the essence of the instrument. . . . 3. Loosely, a term, provision, or clause in a contract."); *id.* at 443 ("[C]ovenant. . . . 1. A formal agreement or promise, usu. in a contract or deed, to do or not do a particular act; a compact or stipulation.").[6] Further, the loan agreement enumerates dozens of "Covenants" binding the loan recipients. (Original Loan at 15–27.) One of these provisions, Section 5.3.4, provides in sweeping terms that "Borrower shall observe and perform each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property, including the Loan Documents." (*Id.* at 16.)

In this context, it is eminently reasonable to interpret the "covenant and condition" clause of mortgage Section 2(b), as the Bank does, to cover at least those serious derelictions specifically designated as defaults. Indeed, at least three kinds of events of default are specifically defined – in loan agreement Sections 8.1(i), 8.1(l), and 8.1(n) – to occur upon the violation of certain covenants and conditions in the loan agreement. (*Id.* at 34–35; Loan Amendment at 8.) These cross-references suggest that Section 8.1's list of defaults comprises, if anything, a *subset* of the universe of noncompliance with covenants and conditions proscribed by mortgage Section 2(b).

Here, it is plaintiffs who fatally fail to supply a limiting principle for their position. Plaintiffs deny that the "mere existence" of a default counts as a violation of covenants and conditions, suggesting that simply "by paying the amounts due and owing under their respective Loans . . . Plaintiffs would have truly and timely abided by and complied with all of the covenants and conditions set forth in their respective Loan Documents." (Pls.' Reply Mem. at 8.) But under this reading, the separate "covenants and conditions" clause "would,

---

[6] When terms are not defined, "it is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011) (quoting *Mazzola v. Cty. of Suffolk*, 143 A.D.2d 734, 735 (2d Dep't 1988)).

therefore, be rendered surplusage – a construction that cannot be countenanced under our principles of contract interpretation." *Matter of Viking Pump, Inc.*, 27 N.Y.3d 244, 261 (2016). If the parties meant to trigger the release of the Bank's security interest immediately upon simply repaying the loan, they could have so provided; as it is, the mortgage as executed imposes an additional hurdle of compliance with the covenants and conditions. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'" (omission in original) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)).

Plaintiffs suggest that mortgage Section 2(b)'s "covenant and condition" clause should not be read to cover defaults, notwithstanding its most natural meaning, because loan agreement Section 8.2 separately provides the Bank several other remedies in an event of default. In effect, plaintiffs ask the Court to infer an implied caveat to mortgage Section 2(b): in order to receive the release of the Bank's security interests upon repayment, the borrowers must "abide by and comply with each and every covenant and condition set forth in the Loan Documents, *unless an exclusive remedy for their violation is already provided elsewhere.*" Whatever its merits in the abstract, this argument fails at its premise: nothing in Section 8.2 indicates that its list of remedies is exhaustive. Indeed, countless other provisions of the loan documents specify additional consequences and remedies for events of default. As discussed above, for instance, Section 2.3.1 allows the Bank to alter the order of priority in which it applies loan repayments; the loan agreement and mortgage are replete with other examples.[7] The fact that defaults have other consequences under the loan documents cannot justify an inference reading them out of mortgage Section 2(b).

Nor do plaintiffs offer any satisfactory reason to treat a cross-default differently from any other contractually defined event of default for this purpose. While it is true that the 2010 amendment to mortgage Section 2(b) did not incorporate any express reference to the Related Property Loans, the direct effect of amended loan agreement Section 8.1(k) is to make a default on one of the three loans trigger defaults on its two counterparts as well. (Loan Amendment at 8.) A cross-default is a bona fide default, and hence a violation of a covenant or condition, on each set of Loan Documents.

By the plain meaning of the loan documents, the Bank is correct that the continuance of an event of default – including a cross-default – would preclude LVP Associates and 349 Associates from receiving the return of their security interests upon repayment of their respective loans. As a factual matter, the parties vigorously contest whether or not there exist events of default on the three Profeta loans. (*See, e.g.*, Pls.' Reply 56.1 Statement ¶¶ 41–52.) In the context of this declaratory judgment action, the parties have not asked the Court to resolve that dispute and the Court will not do so.

---

[7] *E.g.*, Original Mortgage at 5–12; Original Loan §§ 2.2.2, 3.2, 3.5, 3.6, 3.7, 5.2, 5.6, 5.7.2(b), 5.9, 5.15.2(b)(i), 5.16, 5.19, 5.26, 6.3.1, 7.2.2, 7.4, 9.10.

### III. CONCLUSION

For the reasons set forth in this Opinion, the Court grants plaintiffs' motion to the extent that it declares that plaintiffs are permitted "to repay in full their respective loans and have all repayment proceeds be applied strictly to their respective loans and no other loans," and otherwise denies that motion. In addition, the Court grants the Bank's cross-motion for summary judgment in its favor to the extent that it denies plaintiffs' request for a declaration that plaintiffs are entitled to "a release of any security interest held by the Bank on their commercial buildings upon repayment in full of their respective loans," and otherwise denies that cross-motion.

Dated: New York, New York
      November 16, 2017

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.